UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LAWRENCE S. PETIT, | CASE NO. 5:13CV612 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| DALE ADAMS ENTERPRISES, et al., | MEMORANDUM OPINION AND ORDER |
| Defendants. | |

This matter is before the Court upon the Motion for Summary Judgment filed on behalf of Defendants, Dale Adams Enterprises ("DAE") and Dale Adams ("Mr. Adams") on February 6, 2014. ECF Dkt. # 22. Plaintiff, Lawrence S. Petit filed his opposition brief on March 6, 2014. ECF Dkt. #29. Defendants filed their reply brief on March 24, 2014. ECF Dkt. #31.

Plaintiff brings this action to recover lost wages under the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. § 216(b), the Ohio Minimum Wage Act ("OMWA"), Ohio Rev.Code Chapter 4111, and the Ohio Prompt Pay Act ("OPPA"), Ohio Rev.Code §4113.15 (collectively "state wage statutes").

In their motion for summary judgment, Defendants assert that Plaintiff's position at DAE was properly classified as "exempt" under the FLSA because the position meets the qualifications for the executive exemption under 29 C.F.R. § 541.100. Defendants further assert that Mr. Adams is not an "employer," as that term is defined by the FLSA. Defendant asserts that the provisions of the FLSA act with equal force in precluding Plaintiff's claims under the state wage statutes as well. Next, Defendants argue that Plaintiff waived his claim to overtime because he failed to avail himself of DAE's method for tracking hours. Finally, Defendants contend that, assuming *arguendo*, Plaintiff is not exempt from the provisions of the FLSA, any violation of the Act by Defendants was not willful.

**I.     STANDARD OF REVIEW**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2541, 91 L.Ed.2d 202 (1986)(quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001)(citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). However, " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,' " *Wiley v. U.S.*, 20 F.3d

222, 227 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams*, 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir.2000).

## II. FLSA

Generally, under the FLSA, any employee who works more than forty hours in a workweek must receive overtime compensation. See 29 U.S.C. § 207(a)(1). However, an employer need not pay overtime if the employee is "employed in a *bona fide* executive, administrative, or professional capacity" as defined by regulations or promulgated by the Secretary of Labor. See 29 U.S.C. §213(a)(1).

FLSA overtime exemptions are "affirmative defense[s] on which the employer has the burden of proof," *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), and those exemptions "are to be narrowly construed against the employers seeking to assert them." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). See *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir.2007).

The Sixth Circuit has observed that an employer "must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption.' " *Ale v. TVA*, 269 F.3d 680, 691 n. 4 (6th Cir.2001) (quoting *Roney v. United States*, 790 F.Supp. 23, 26 (D.D.C.1992)). However, the Court later observed that "the employer claiming an FLSA exemption does not bear any heightened evidentiary burden." *Thomas*, 506 F.3d at 502-03. In *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 576 (6th Cir.2007), the court explained:

> We clarify here that the phrase "clear and affirmative evidence" does not heighten [the defendant's] evidentiary burden when moving for summary judgment. The word "clear," as used in this phrase, traces to the "clearly erroneous" Rule 52(a) standard, but the standard is inapposite to our current review of a motion for summary judgment. And because establishing the applicability of an FLSA exemption is an

-3-

affirmative defense, [the defendant] has the burden to establish the ... elements by a preponderance of the evidence.

The Department of Labor regulations, as amended in 2004, provide that an employee qualifies for the executive exemption if the employee: (1) is paid a salary not less than $455.00 per week; (2) has a "primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (3) regularly directs two or more employees; and (4) has "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(1)-(4); see *Burson v. Viking Forge Corp.*, 661 F.Supp.2d 794 (N.D.Ohio 2009).

The issue of how an employee spends his time at work is a question of fact. *Koppinger v. American Interiors, Inc.*, 295 F.Supp.2d 797, 800 (N.D.Ohio 2003). However, whether an employee's particular activities exclude him or her from the overtime provisions of the FLSA is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986) ("The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law ..."); *Ale v. Tennessee Valley Authority*, 269 F.3d 680, 691 (6th Cir.2001). ("The ultimate question of whether the magistrate judge correctly determined that an employee is exempt is a question of law that we review *de novo*.").

Here, the parties agree that Plaintiff's weekly earnings exceeded $455.00, and, thus, the first element of the executive test is not in dispute. With respect to the second element, the primary duty test analyzes the following four factors: (1) the amount of time the employee spends on exempt work; (2) the relative importance of the employee's management[1] activities; (3) the employee's

---

[1] 29 C.F.R. 541.102 defines "management" as including, but is not limited to, activities such as:

interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be

-4-

relative freedom from supervision; and (4) the employee's salary compared with others performing non-exempt work. *Thomas*, *supra*, at 505. The *Thomas* Court emphasized that the fact-finder may not rely upon Plaintiff's or Defendants' characterization of Plaintiff's position, but, instead, " 'look at [Plaintiff's] actual duties' to determine whether [he] qualifies for the executive exemption." *Thomas*, citing *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 692 (6th Cir.2001).

Section 541.700, captioned "Primary duty," reads, in its entirety:

(a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

(c) Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

Of considerable significance to the case *sub judice*, the Sixth Circuit has specifically acknowledged that "[t]he words 'in charge' are not a magical incantation that renders an employee a *bona fide* executive regardless of his actual duties." *Ale* at 691; see also *Indergit v. Rite Aid Corp.*, 2010 WL 1327242 at *18 (S.D.N.Y Mar. 31, 2010)101 ("[T]he words 'in charge' [or 'highest

---

bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

ranked] are not[, however,] a magical incantation that render an employee a *bona fide* executive regardless of his actual duties.'")

On the other hand, concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise met. 29 C.F.R. §541.106. Whether an employee meets the requirements of §541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in §541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

Shortly after the FLSA was enacted, the Supreme Court expressed concern that an employer could circumvent the Act's requirements – and thus gain an advantage over its competitors – by having its employees waive their rights under the Act. See *Brooklyn Savs. Bank v. O'Neil*, 324 U.S. 697, 706–10, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Such waivers, according to the Court, would "nullify" the Act's purpose of "achiev[ing] a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act." *Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am.*, 325 U.S. 161, 167, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945); see also *O'Neil*, 324 U.S. at 707, 65 S.Ct. 895. The Court therefore held that employees may not, either prospectively or retrospectively, waive their FLSA rights to minimum wages, overtime, or liquidated damages. *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 114, 66 S.Ct. 925, 90 L.Ed. 1114 (1946); *O'Neil*, 324 U.S. at 707, 65 S.Ct. 895; see also *Runyan v. Nat'l Cash Register Corp.*, 787 F.2d 1039, 1041-42 (6th Cir.1986) (*en banc*).

### **III. FACTS**

DAE is divided into three parts, the creeper or bone shop[2] (which is not the subject of this lawsuit), the sleeve shop, and the car restoration shop. Work in the car restoration shop during Plaintiff's employment at DAE was dedicated exclusively to the restoration of a 1934 Packard V-12 1108 Dietrich Convertible Victoria owned by Joseph Cassini, which ultimately won Best in Show at the 2013 Concours d'Elegance in Pebble Beach, California.

It is important to note that the classification of Plaintiff's work at DAE is muddied by the small size of the sleeve and car restoration shops, and the informality of the work process in both shops. The sleeve shop and car restoration shop did not employ more than a handful of men at any given time relevant to the complaint, and employee roles at DAE were not clearly defined. Therefore, the loose organizational structure only adds to the difficulty of reaching a conclusion regarding Plaintiff's alleged exempt status.

DAE is a family business: At his deposition, Mr. Adams acknowledged that although he is the president of the company, he is also the janitor. Adams Depo . at 9. Mr. Adams' wife, Josie Adams ("Mrs. Adams") is the vice president of DAE, and his son Jeremy Adams ("Jeremy") is in charge of day-to-day operations.

Defendants contend that Plaintiff, who is a journeyman machinist, was hired for his skills as a machinist, but was also entrusted with the management and supervision of the sleeve shop and the car restoration shop in Mr. Adams' absence. Deposition of Dale Adams, ECF Dkt. #27, at 68, 80.Deposition of Jeremy Adams, ECF Dkt. #26 at 39, 48-49, 50. Jeremy testified that Mr. Adams, the artistic vision behind the restoration of the Packard, preferred to work on the Packard in the

---

[2]It is interesting to note that the employee assigned to oversee the "day to day operations" in the creeper shop, Phil Neuman ("Mr. Neuman"), who Mr. Adams described as Plaintiff's counterpart "downstairs," is an hourly employee. Adams Depo. at 26. Mr Adams testified that Mr. Neuman "essentially did the same thing [Plaintiff] did, keeps everybody lined up, make[s] sure people were there on time." Adams Depo. at 26. However, after Mr. Adams conceded that Mr. Neuman is an hourly employee, he added that "[Mr. Neuman's] job is much simpler than the upstairs job. We just do the same thing over and over again." Adams Depo. at 27. Mr. Adams further testified that Mr. Neuman had no purchasing authority. Adams Depo. at 27. However, Mr. Adams alter testified that Mr. Neuman was involved in the hiring process at DAE.

afternoon and well into the evening, and preferred to avoid addressing the various questions of the employees regarding the days' work. Jeremy Depo. at 22.

Plaintiff obtained his journeyman's card in 1986. Deposition of Lawrence Petit, ECF Dkt. #23. He began as an apprentice in 1980 and worked as a machinist for 20 years at R.F. Cook. Petit Depo. at 6-9. As a machinist for R.F. Cook, he manually set up lathes, mills, surface grinders and OD grinders. Petit Depo. at 8-9.

In 1999, he was promoted to the position of Sales Manager. When Plaintiff worked as a machinist at R.F. Cook, he was paid hourly. Petit Depo. at 9. He started in 1980 at $4.50 per hour and by 1999, he was making $15.00 to $16.00 per hour. When he left the shop floor and became a Sales Manger, R.F. Cook paid him a $52,000.00 a year salary because "[he] was in the office." Petit Depo. at 11. As a sales manager for R.F. Cook, he engaged in the production and maintenance of business relationships; for example, he quoted jobs that came in from the customers, went out and visited customers, and tried to generate new work. He earned $52,000.00 per year from 2000 to 2007.

In 2008, R.F. Cook experienced a slow down in the market for its products and as a result it reduced Plaintiff's hours to 32 per week. Petit Depo. at 13. As a result of the reduction in hours, his salary was cut to $39,000.00 per year, which was a substantial reduction according to Plaintiff. Petit Depo. at 14. From 2008 until September of 2010, Plaintiff worked 32 hours per week. Petit Depo. at 15.

To supplement his income, Plaintiff looked for other part-time work. Because his hobby was woodworking, Plaintiff responded to DAE's advertisement, which sought a highly skilled woodworker in its car restoration business. Petit Depo. at 16. Plaintiff interviewed with Mr. and Mrs. Adams, who told him that they did not have part-time hours for the woodworker position because they had hired Thomas E. Cary, II ("Mr. Cary"). However, Plaintiff was offered a job as a full-time machinist.

Plaintiff told the Adamses that he was not looking for full-time work but he was approached by them two additional times and he ultimately agreed to work at DAE for $52,000.00 a year and medical benefits equal to that which he received from R.F. Cook. Petit Depo. at 19-21. Defendants

agreed to this arrangement, and underscore the fact that Plaintiff's salary constitutes the highest salary in DAE history. Jeremy Adams Depo. at. 48-49. Defendants argue that Plaintiff's salary, which was equal to his salary as a sales manager, demonstrates that Plaintiff was being compensated for both his non-exempt work as well as his supervisory role at DAE. According to Plaintiff, he was told by Mr. Adams when he was hired that he would be working the machines in the car restoration shop, not that he would be working in the sleeve shop as well. Petit Depo. at 21. Jeremy testified that Plaintiff was initially employed to supervise the car restoration shop, and later given authority over the sleeve shop. Jeremy Depo. at 24.

During the first two weeks that Petit worked for DAE, he was paid hourly. His rate was $25.00 per hour based on a 40 hour week, which equaled the $52,000.00. At his deposition, Plaintiff testified that he had let the Adamses know that "he would be willing to be on salary just to keep a steady payroll for them." Petit Depo. at. 23. He further testified that "at first [the Adamses] didn't pay [him] a salary. . .and then [Mr. Adams] came out and asked [him] if they would like to take me up on that offer about putting me on salary, and [Plaintiff] siad that would be fine." Petit Depo. at 23. Defendants, on the other hand, contend that the first two weeks were a probationary period, and that they agreed to make Plaintiff a salaried employee when his employment became "a solid thing." Jeremy Depo. at 45. Mr. Adams testified that Plaintiff had no fixed hours. Adams Depo. at 117-118.

Both Mr. Adams and Jeremy testified that Plaintiff had the ability to "come and go" as he pleased. Adams Depo. at. 117-118. Jeremy Depo. at 60. However, when Plaintiff first started working for Defendants, his normal hours were 8:30 a.m. until 5:00 p.m. According to Defendants, Plaintiff was responsible for supervising the employees in the sleeve and car restoration shops from 8:30 a.m. until 2 p.m., the time that Mr. Adams typically arrived at DAE each work day. Plaintiff's co-workers in the restoration shop were Mr. Adams, Mr. Cary, and Dave Montaro. Joint Statement of Facts, ECF Dkt. #46 at ¶¶ 9, 30.

When Plaintiff first began working in the restoration shop, DAE employed George M. Barrick ("Mr. Barrick") and "Alan" in the sleeve shop. Petit Depo. at 30. According to Plaintiff, his initial contact with the sleeve shop involved fixing broken parts that Alan or George brought him. When Alan got fired and George left, Plaintiff claims that he had to make "more regular visits" to

the sleeve shop. Petit Depo. at 37. Mr. Adams conceded that there was a lot of turnover in the sleeve shop. Adams Depo. at 113. However, according to Plaintiff's deposition testimony, Defendants warned Plaintiff against being in the sleeve shop too often, so he spent as little time as possible in the sleeve shop. Petit Depo. at 44-46.

In 2012, Plaintiff's sons, Larry Petit and Luke Petit, were hired by DAE. Defendants contend that Plaintiff hired his sons, but, in fact, the evidence shows that Plaintiff asked Mr. Adams to employ his sons. Larry worked with Plaintiff in the restoration shop and Luke worked in the sleeve shop. Plaintiff first asked Mrs. Adams if the Adamses would hire his son Larry, but she responded that they would not, "because [the Adamses] wouldn't hire family." Petit Depo. at 40. After Mrs. Adams refused to hire Larry, Plaintiff approached Mr. Adams. Mr. Adams testified that Plaintiff spent an inordinate amount of time in the sleeve shop training Luke and helping his sons.

The hours Plaintiff worked and the tasks he performed are documented in time logs that Defendants required employees to keep for purposes of billing their clients in the car restoration shop. Defendants produced these time logs, which reflect work performed by Plaintiff from September 2010 through March of 2012, including descriptions of the tasks performed and the time spent completing those tasks. Plaintiff contends that the logs show that he spent well over 86 percent of his time performing manual tasks such as "boring", "riveting", "honing", "making fixtures", "repairing roof", and "repairing machines." Defendants contend that the logs show that Plaintiff spent a significant portion of time "helping" in the sleeve shop. See also Adams Depo. at 147. However, Plaintiff contends that the records demonstrate that in any given week, his presence in the sleeve shop was insignificant compared to the time spent performing routine machining.

There is also evidence in the record that Plaintiff used the time clock at DAE until he asked Mr. Adams if he could stop clocking in and out because work on the Packard was completed. Petit Depo. at p. 102. At his deposition, Plaintiff explained that he asked to stop using the time clock because the rest of the car restoration shop employees were gone and there was "nobody to fool." Petit Depo. at p. 103. Evidently, Plaintiff used the time clock in order to prevent the other employees in the car restoration shop from discovering that he was a salaried employee.

-10-

According to Mr. Adams, DAE stopped billing for the car in October of 2011 (when DAE reached the maximum billed price for the restoration), but that the work on the Packard was not complete until March of 2013.[3]  Adams Depo. at p. 19.  Although Mr. Adams agrees that Plaintiff stopped using the time clock after the work on the Packard was complete, Mr. Adams contends that the information provided in the billing sheets and the time cards is inconsistent.  Adams Depo. at p. 18.

Plaintiff performed varied and complicated non-exempt work at DAE.  He was tasked with making one-of-a-kind parts and hardware through the use of machining techniques which included brazing, welding, grinding, polishing, milling and lathing.  He also programmed machines in the sleeve machine shop, set tools, turned the machines on for the unskilled operators, repaired and performed necessary maintenance on the sleeve shop machines, and even fixed the facility's roof and outdoor sprinkler system.

Relying on both his journeyman experience and training from Mr. Adams, Petit showed the non-skilled sleeve shop operators how to operate the machines.  Once a sleeve shop employee knew how to set up and run the machines, Plaintiff asserts that he was no longer needed.  Experienced sleeve shop workers would then train others who did not know how to run the machines. However, as stated previously, turnover was common in the sleeve shop.

Mr. Adams valued Plaintiff's knowledge and experience.  Plaintiff recommended two techniques, one involving the installation of pistons and rings, and the other a method of "shrink fitting," which were adopted at DAE.  ECF Dkt. #46 at ¶¶ 17-19.

Plaintiff's allegedly  non-exempt work included communicating Mr. Adams' specific task lists to employees each day.  At the end of each work day, Mr. Adams would provide instructions to Plaintiff as to the tasks for the following day.  ECF Dkt. #46 at ¶7.  Plaintiff also helped other

---

[3]Plaintiff left DAE in January of 2013, but he testified that he stopped using the time clock when the work on the Packard was complete.  Mr. Adams testified that work on the Packard was not complete until March of 2013, however, he added that he finished "the last of the work." Adams Depo. at 19.  There is no indication in the record when the other car restoration shop employees finished their part of the work on the Packard. Plaintiff's weekly time cards end in mid-August of 2012, although a few stray time cards dated after August of 2012 are included in the record. ECF Dkt. #26-1.

employees when they encountered problems by answering technical questions and providing employees with guidance when they were unsure as to how to proceed with a task. ECF Dkt. #46 at ¶ 39.

In addition to asking Mr. Adams to employee both of Plaintiff's sons, Plaintiff was also involved in another employee's termination. Plaintiff recommended the termination of an employee, Charles W. Adkins, for failing to follow Plaintiff's instructions. Mr. Adkins had only worked at DAE a few weeks, when Plaintiff recommended that he be terminated. In fact, Plaintiff signed the termination letter, on which he was identified as a shop foreman, along with Jeremy, who was identified as general manager. The letter read, in pertinent part, "[Adkins] has also refused to follow instructions in regards to his position as a production machine shop operator from his Foreman, Lawrence Petit." See ECF Dkt. #27-1. Plaintiff testified that he signed the termination as a witness. Petit Depo. at 114. It is important to add that Jeremy testified that Mr. Barrick, a non-exempt employee in the sleeve shop was also referred to as the foreman, and that another employee, Alan Stevenson, was terminated without Plaintiff's signature. Jeremy Depo. at 26, 64.

Plaintiff also placed orders for parts and supplies from certain vendors. Petit Depo. at 114-115. Although Plaintiff was not the only employee with purchasing authority, Defendants contend that no other employee was entrusted to determine DAE's requirements and place orders involving thousands of dollars on behalf of DAE.

Defendants contend that Plaintiff, like Mr. Adams, exercised considerable decision-making authority at DAE, including the direction of work. Mr. Adams testified that Plaintiff "managed" the sleeve shop, he made his own hours, and that he got to "call the shots," which other car restoration employees did not. Adams Depo. at 117. Mr. Adams further testified that although he (Mr. Adams) "ran the show," he did so through consultation with [Plaintiff.]" Adams Depo. at p. 72. According to Mr. Adams' testimony, Plaintiff was given greater responsibility because he was a salaried employee. Adams Depo .at 78. Mr. Adams explained that Plaintiff's job was "prestigious" and that his goal in making Plaintiff a salaried employee was to "give [Plaintiff] a cushy job that he could take a lot of pride in." Adams Depo. at 134.

-12-

Sleeve shop employee, Brian Rouse and car restoration shop employee, Mr. Cary, confirmed that Plaintiff was their supervisor, and that they went to Plaintiff in Mr. Adams' absence. Deposition of Brian Rouse, ECF Dkt. #24 at 21-22. Deposition of Thomas Cary, ECF Dkt. #25 at 36, 42, 50.

Plaintiff was injured and missed two months of work at the end of 2012.  Petit Depo. at 109. Roughly one week after he returned to DAE, on January 9, 2013, Plaintiff quit his job after a heated dispute regarding his job performance with Mr. Adams. Petit Depo. at 109.  After leaving DAE, Plaintiff returned to R.F. Cook as a machinist.  On the application Plaintiff completed for re-employment at R.F.Cook on February 7, 2013, he listed his job at DAE as a machinist position paying $25.00 per hour.  Petit Depo. at 105; see also ECF Dkt. #23 at 491.  The above-captioned case was filed approximately two months after Plaintiff quit his job at DAE.

### IV. ANALYSIS

#### A. Executive exemption

Plaintiff advances several argument against the entry of judgment in favor of Defendants in this case.  First, Plaintiff argues that his supervisory authority was illusory to the extent that he merely acted as a conduit for Mr. Adams' instructions.  However, nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive.' " *Beauchamp v. Flex-N-Gate, LLC*, 357 F.Supp.2d 1010, 1017 (E.D.Mich.2005); see also *Thomas*, 506 F.3d at 507.

The fact that Mr. Adams retained control over certain management decisions and dictated how other decisions were to be made did not undermine Plaintiff's authority to direct the actions of DAE employees in the car restoration shop and the sleeve shop. "Active supervision [ ] do[es] not eliminate the day-to-day discretion of the on-site manager." *Murray v. Stuckey's Inc.*, 50 F.3d 564, 570 (8th Cir.1995).

Even in situations where a supervisor, himself, is subjected to the close supervision of his superior, courts have routinely found that the supervisors responsible for the daily activities of their subordinates are vested with enough discretionary power and freedom from supervision to qualify for the executive exemption. *Mitchell*, 428 F.Supp.2d at 743 (rejecting argument that supervisor was merely complying with directives from higher level management); see, e.g., *Thomas*, 506 F.3d at

507 ("Even though [supervisor's] discretion was somewhat circumscribed by her district manager's supervision [...] she daily exercised discretion over matters vital to the success of her station."); *Kastor v. Sam's Wholesale Club*, 131 F.Supp.2d 862, 868 (N.D.Tex.2001) (the fact that a manager had to obtain approval from time to time did not undermine his authority as a supervisor); *Haines v. Southern Retailers, Inc.*, 939 F.Supp. 441, 450 (E.D.Va.1996) (manager who could not hire, fire, or discipline without approval from her superior's approval still retained enough discretion over day-to-day activities to warrant the executive exemption).

Despite the foregoing case law, however, this Court nonetheless finds that genuine issues of material fact preclude summary judgment in favor of Defendants on the remaining three prongs of executive exemption test. First, although it is true that there is evidence in the record to show that Plaintiff requested a salary, rather than an hourly wage, an employee cannot waive the application of the FLSA. Second, although Plaintiff was "in charge" in Mr. Adams' absence, the evidence could be interpreted to show that he was a technical troubleshooter, with no discretion in executing Mr. Adams' orders for each day. Plaintiff was not entrusted with many of the typical management responsibilities set forth in 29 C.F.R. §541.102.

There is conflicting evidence in the record regarding the amount of time Plaintiff spent performing exempt work, as well as conflicting testimony regarding the relative importance of Plaintiff's management activities. Although it appears that Plaintiff was in charge of more than two employees at any given time during his employment with DAE, his duties of supervision are not clear from the record due to the revolving door in the sleeve shop. Although Defendants contend that Plaintiff had influence over the hiring and firing of employees at DAE, the only employees at DAE that Plaintiff encouraged Mr. Adams to hire were his sons. Moreover, Mr. Adams appears to have credited Plaintiff's recommendation regarding the termination of Mr. Adkins, but Mr. Adkins' termination is the only termination in which Plaintiff was involved, despite the admitted turnaround in the sleeve shop. Finally, although Plaintiff was the highest paid non-family member at DAE, his salary may have reflected the degree of skill he brought to the machinist position, and, is only one factor in determining Plaintiff's alleged exempt status.

Accordingly, the Court finds that genuine issues of material fact exist with respect to the second, third, and fourth elements of the executive exemption test.

### B. Mr. Adams as employer

Next, Defendants contend that Mr. Adams is not an "employer" as that term is defined by the Act. Despite the broad definition of the term "employer" contained in the FLSA, that is, "any person acting directly or indirectly in the interest of an employer in relation to an employee," and Sixth Circuit authority stating that individual owners are employers to be held personally liable for damages where they exercise operational control, Defendants nonetheless move for summary judgment as to Mr. Adams' status. Defendants contend that although Mr. Adams is the president of DAE, Jeremy is the general manager, and therefore, Mr. Adams does not have operational control of DAE.

However, there is sufficient evidence in the record to show that Mr. Adams directed the operations in the car restoration shop and that Mr. Adams was instrumental in the employment of both of Plaintiff's sons at DAE. "The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation and is jointly and severally liable under the FLSA for unpaid wages." *Dole v. Elliot Travel and Tours, Inc.*, 942 F.2s 962, 965 (6th Cir. 1991). To be classified as an employer, it is not required that a party have exclusive control of a corporation's day to day functions, The party need only have "operational control of significant aspects of the corporation's day to day functions." *Id.* at 966. As a consequence, the Court determines that genuine issues of material fact preclude summary judgment on Mr. Adams' status as an "employer" as that term is defined by the Act.

### C. Time records

Third, Defendants contend that Plaintiff has failed to maintain a record of his overtime at DAE and, therefore, should not be permitted to recover overtime pay pursuant to the FMLA or the state statutes. In *Wood v. Mid-Am. Mgmt. Corp.*, 192 Fed App'x 378 (6th Cir.2006), the Sixth Circuit affirmed the entry of summary judgment against an employee who sought compensation for unreported overtime wages. Wood reported some overtime hours but chose not to record others because of the administrative inconvenience. *Id.* at 380. Even though Wood claimed that he told his

-15-

supervisor that he had worked other unreported hours, the Sixth Circuit affirmed judgment in the employer's favor because the employee's supervisor told him that he needed to report all overtime. *Id.* at 380-81.

The Northern District of Ohio applied the same rationale in *Frisby v. Keith D. Weiner & Associated, Co.,* 2010 WL 1630107 (N.D. Ohio). Frisby testified that she did not always clock in to the company's system when working from home because she "didn't want to take the time to go upstairs to log on to the computer and to get on the server." *Id.* at *5. Frisby further testified that sometimes she would simply tell her supervisor the number of overtime hours she worked. When asked if her supervisor instructed her explicitly to report all of her time, Frisby responded, "I don't know in those words," but that her supervisor said generally, "I appreciate how hard you work. You should – maybe you should say you should be paid for it." *Id.*

The facts giving rise to the overtime claim in this action are clearly distinguishable from the facts in the forgoing cases. Here, the finder of fact may conclude that Plaintiff was unaware of both his rights under the FLSA and his duty to maintain overtime records. Although Plaintiff requested that he no longer clock after the Packard was complete, it appears that logs and time cards reflect the hours Plaintiff worked at DAE. To the extent that conflicts exist in the logs and time cards, the finder of fact may credit the testimony at trial and the exhibits admitted into evidence to determine the sufficiency of the evidence to establish the alleged lost wages.

### D. Willfulness

An ordinary violation of the FLSA is subject to a two-year statute of limitations. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, 108 S. Ct. 1677 1680, 100 L.Ed.2d 115 (1988). However, where a violation is "willful" a three year statute of limitations applies. *Id.* To obtain the benefit of the three-year exception, the Plaintiff must prove that the employer's conduct was willful as that term is defined in [*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111,125-30, 105 S. Ct. 613, 623-26, 83 L.Ed.2d 523 (1985)]." The standard of willfulness adopted in *Thurston* requires the Plaintiff to show "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute…" *Id.* at 133, 108 S. Ct. at 1681.

-16-

The issue of willfulness in relation to the applicable statute of limitations is to be treated the same as any other factual determinations routinely submitted to a jury. See *Kowalski v. Kowalski Heat Treating Co.*, 920 F. Supp. 799, 805 (N.D. Ohio 1996); citing *Fowler v. Land Management Groupe, Inc.*, 978 F.2d 158, 163 (4th Cir.1992). The Sixth Circuit has found a violation to be willful where the undisputed evidence shows that the employer had actual notice of the requirements of the FLSA by virtue of earlier violations, an agreement to pay unpaid overtime wages, and assurances of future compliance of the Act. See *Dole v. Elliot Travel Tours, Inc.*, 942 F.2d at 967.

A willful violation of the FLSA precludes a finding of good faith and liquidated damages must be awarded. See *Herman v. Palo Group Foster Home*, 183 F.3d 468, 474 (6th Cir. 1999) ("[a]bsent a good faith disagreement with the authority of the government to promulgate the statute, a finding of willfulness is dispositive of the liquidated-damages issue"); *EEOC v. City of Detroit Health Dep't., Herman Kiefer Complex*, 920 F.2d 355, 356 (6th Cir. 1990)(holding "that once the jury determined that the [defendant] willfully violated the Equal Pay Act, the district judge had no discretion not to award liquidated damages").

Plaintiff argues that Defendants were put on notice of the requirements of the FLSA, as they were subject to a Department of Labor investigation for unpaid wages in 1994. Pursuant to the report, Defendants complied with the findings by remitting unpaid wages to the aggrieved employee. Plaintiff further contend that Defendants knew Plaintiff was working overtime as Mr. Cary testified that car restoration shop employees were required to work a fifty-hour workweek. Cary Depo. at 29. Defendants counter that Jeremy, who runs the day-to-day operations at DAE was not employed at DAE in 1994, and, therefore, Plaintiff should not be permitted to rely on the previous violation to establish willfulness. The Court finds that genuine issues of material fact exist with respect to the alleged willfulness of the alleged FMLA violation.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. ECF Dkt. #22.

IT IS SO ORDERED.

>  */s/ George J. Limbert*
> GEORGE J. LIMBERT
> UNITED STATES MAGISTRATE JUDGE